# EXHIBIT A

1                                          Volume: 1
                                           Pages:  1-255
2                                          Exhibits: 1-45

3
                        UNITED STATES BANKRUPTCY COURT
4                          DISTRICT OF MASSACHUSETTS
                              EASTERN DIVISION
5
        ****************************
6       In Re:

7       LAURA M. SHEEDY
                 Debtor                    CHAPTER 13 BANKRUPTCY
8       _____   No. 10-16236-JNF

9       LAURA M. SHEEDY,
                    Plaintiff,             ADVERSARY PROCEEDING
10                                         No. 11-01137

11      V.

12      DEUTSCHE BANK NATIONAL
        TRUST COMPANY, AS TRUSTEE,
        and JPMORGAN CHASE BANK,
13      NATIONAL ASSOCIATION,
                    Defendants.
14
        ***************************
15
               DEPOSITION OF LAURA M. SHEEDY, taken
16      on behalf of the Defendants, pursuant to Rule 30
        of the Federal Rules of Civil Procedure, made
17      applicable to this proceeding by Rule 7030 of
        the Federal Bankruptcy Rules, before
18      Isolde von Handorf-Choquet, a Registered
        Professional Reporter and Notary Public in and for
19      the Commonwealth of Massachusetts, at Bulkley,
        Richardson & Gelinas, 125 High Street, Oliver
20      Street Tower, 16th Floor, Boston, Massachusetts
        02210, on Tuesday, November 29, 2011, commencing
21      at 10:15 a.m.

22
                        Isolde von Handorf-Choquet
23           96 Franklin Avenue, Chelsea, Mass. 02150
                            617 543-5924
24                       Isolde721@aol.com

1    <u>A P P E A R A N C E S</u>

2    DAVID G. BAKER, ESQ.
     236 Huntington Avenue, Room 306
3    Boston, Massachusetts 02115
               On behalf of the Debtor/Plaintiff.

4
     ABENA A. MAINOO, ESQ.
5    DONN A. RANDALL, ESQ.
     Bulkley, Richardson and Gelinas, LLP
6    125 High Street
     Oliver Street Tower, 16th Floor
7    Boston, Massachusetts 02210
     617.368.2500 amainoo@bulkley.com
8                  drandall@bulkley.com
               On behalf of the Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

<u>I N D E X</u>

<u>Witness:</u>                                            <u>Page</u>

Laura M. Sheedy

     Examination by Ms. Mainoo                    6


<u>E X H I B I T S</u>

<u>No.</u>              Description                    <u>Page</u>

1        Notice of Deposition              7

2        Verified Complaint               22

3        Deed                             29

4        Purchase & Sale Agreement        39

5        Quitclaim Deed                   41

6        Mortgage dated February 8, 1993  43

7        Mortgage dated September 7, 1994 47

8        Mortgage dated June 25, 1997     51

9        Mortgage dated April 16, 1999    52

10       Mortgage dated July 12, 2000     55

11       Mortgage dated August 31, 2000   57

12       Mortgage dated April 9, 2003     81

13       2004 Income Tax Return           96

14       Deed                            112

15       Deed                            113

16       Deed                            115

17       Quitclaim Deed 15-17 Page Place 124

| No. | Description | Page |
|-----|-------------|------|
| 18 | Unit Deed, 17 Page Place | 130 |
| 19 | Unit Deed, 17 Page Place | 132 |
| 20 | Residential Loan Application | 134 |
| 21 | Addendum to Loan Application | 154 |
| 22 | ARM Loan Disclosure Statement | 160 |
| 23 | Fixed/Adjustable rate Note | 162 |
| 24 | Addendum to Note | 168 |
| 25 | Truth&Lending Disclosure Statement | 170 |
| 26 | Fixed/Adjustable Rate Rider | 177 |
| 27 | Prepayment Fee Note Addendum | 180 |
| 28 | Good Faith Estimate | 181 |
| 29 | Settlement Statement | 181 |
| 30 | Mortgage | 184 |
| 31 | Addendum to HUD-1 | 187 |
| 32 | Disbursement Authorization | 190 |
| 33 | Notice of Right to Cancel | 191 |
| 34 | Notice of Right to Cancel | 191 |
| 35 | Letter dated March 23, 2009 | 207 |
| 36 | Letter dated March 22, 2010 | 209 |
| 37 | Letter dated March 22, 2011 | 210 |
| 38 | Letter dated October 16, 2009 | 214 |
| 39 | Letter dated November 23, 2009 | 215 |
| 40 | Letter dated October 4, 2010 | 216 |

| No. | Description | Page |
|-----|-------------|------|
| 41 | Statement of Eligibility for Loan Modification | 217 |
| 42 | Quitclaim Deed | 227 |
| 43 | Quitclaim Deed | 232 |
| 44 | Forensic Audit Report | 234 |
| 45 | Letter dated August 23, 2010 | 246 |

1        estate transactions?

2    A.    I don't remember.

3    Q.    How long have you worked as a real estate broker?

4    A.    I got my license back in, I think, the early

5        eighties.

6    Q.    Do you remember the --

7    A.    -- but I didn't --

8    Q.    Do you remember the date?

9    A.    No.

10    Q.    How did you get your license to be a real estate

11        broker?

12    A.    I took a real estate class.

13    Q.    Do you remember where you took that real estate

14        class?

15    A.    I think it was Waltham.

16    Q.    What did you learn in the class?

17    A.    How to take the test to become a real estate

18        broker.

19    Q.    Do you remember what subjects were covered on the

20        test?

21    A.    No.

22    Q.    Did you have any training in the real estate

23        business?  Did you have any other training in the

24        real estate business?

1     line, "Sheedy and her husband consider themselves

2     relatively sophisticated in real estate matters".

3  A.  Mm-hmm.

4  Q.  Ms. Sheedy --

5  A.  -- yes.

6  Q.  Have you read this sentence before?

7  A.  Yes, I read the -- yes, I have.

8  Q.  Do you agree with that sentence?

9  A.  The sentence that says "Although Sheedy and her

10     husband consider themselves relatively

11     sophisticated in real estate matters, but not

12     finance, they began -- yes, I did read this

13     before.

14  Q.  Do you agree that you and your husband consider

15     yourselves to be relatively sophisticated in real

16     estate matters?

17  A.  My husband more so than I.

18  Q.  Do you consider yourself relatively sophisticated

19     in real estate matters?

20  A.  More so than an average person, yes.

21  Q.  What do you mean by that?

22  A.  Because I am in real estate, I am more

23     sophisticated; but if you've ever taken a real

24     estate class -- yes, I am, I guess, because of

1        that real estate class and becoming a broker, I

2        am more sophisticated than the average citizen,

3        yes.

4    Q.  When was that real estate class?

5    A.  Back in the eighties, I believe.

6    Q.  When did you become a broker?

7    A.  At the end of that class.

8    Q.  Was that in the eighties?

9    A.  I believe it was the early eighties. I'm not a

10       hundred percent sure. It's been a long time.

11   Q.  Ms. Sheedy, do you own any real property?

12   A.  I am -- no.

13   Q.  Do you own any real estate?

14   A.  No.

15   Q.  Have you ever owned any real estate?

16   A.  I don't know.

17           MR. BAKER: Do you mean other than the home

18       she lives in and owns presently?

19   Q.  Ms. Sheedy, do you own the home that you live in?

20   A.  No.

21   Q.  Who owns that home?

22   A.  It's held in a trust.

23   Q.  Have you ever owned any real property

24       individually?

1    Q.    Who did the Bedfords sell to?

2    A.    I imagine it was an entity.   I'm not sure whether

3          it was -- what entity it was in; but I imagine it

4          was an entity of some sort.

5                 MS. MAINOO: I would like to mark as Exhibit

6          3 the deed from Alan and Sharon Bedford to

7          Thomas Sheedy individually.

8                 (Deed marked as Exhibit No. 3 for

9          Identification.)

10   Q.    Ms. Sheedy, are you familiar with Exhibit 3?

11   A.    No.

12   Q.    Ms. Sheedy, on Page 1 of the deed, the deed

13         states that, We, Alan D. Bedford and

14         Sharon M. Bedford grant to Thomas E. Sheedy

15         individually of 11 Harrington Road, Lexington,

16         Mass., do you know who Thomas E. Sheedy is?

17   A.    Yes.

18   Q.    Who is Thomas E. Sheedy?

19   A.    My husband.

20   Q.    Did the deed convey the property, 11 Harrington

21         Road in Lexington, to your husband, individually?

22   A.    It says it does, yes.

23   Q.    Does Thomas E. Sheedy still own the property at

24         this -- does Thomas E. Sheedy still own 11

1       Harrington Road in Lexington?

2   A.  No.

3   Q.  Who owns that property?

4   A.  A trust.

5   Q.  What is the name of the trust?

6   A.  Cardinal Trust.

7   Q.  How did Cardinal Trust come to own that property?

8   A.  A trust was formed, and the property was placed

9       in a trust.

10  Q.  Who owned the property before it was placed in

11      the trust?

12  A.  I imagine Thomas did.  I don't remember.

13  Q.  Ms. Sheedy, are you familiar with 44 West Park

14      Street, Brockton, Mass.?

15  A.  Again, please, the address?

16  Q.  Does it sound familiar?

17  A.  Not the number, not the West Park -- Brockton is

18      familiar to me.

19  Q.  Why is Brockton familiar to you?

20  A.  I think my husband did business there.

21  Q.  The address is 44 West Park Street in Brockton.

22  A.  Okay.

23  Q.  Are you familiar with that property?

24  A.  I may be.

1   MR. BAKER: That's the fifth time. Please,

2   I will have to start objecting.

3   MS. MAINOO: You can reserve your

4   objections.

5   MR. BAKER: I don't like to interrupt. You

6   are taking deposition, but you are trying to

7   force her to say something she doesn't want to

8   say.

9   Q.   Did you put your signature on Exhibit 6,

10   Ms. Sheedy?

11   A.   It appears that is my signature.

12   Q.   Ms. Sheedy, did you borrow $240,000 in 1993?

13   A.   I do not recall.

14   Q.   On Page 1 of Exhibit 6 is written, "borrower owes

15   lender the principal sum of $240,000," is that

16   correct, Ms. Sheedy; did you borrow $240,000?

17   A.   It's correct that it says the amount of the

18   mortgage is $240,000.

19   Q.   Did you borrow $240,000, Ms. Sheedy?

20   A.   It appears I did.

21   Q.   And the terms of the Note were an adjustable

22   interest rate, is that correct, Ms. Sheedy?

23   A.   That's what it says, yes.

24   Q.   What is an adjustable interest rate Note?

1   A.   Remember what?

2   Q.   Did the mortgage help you to remember if you

3        borrowed money in 1993?

4   A.   Yeah, I mean, that says I did.  That says I did.

5   Q.   Did you borrow $500,000 in 1994?

6   A.   I would have to look at them again, to see if

7        that's --

8   Q.   We can go back to that.  Actually, let's just

9        start from the beginning.  So, going back to

10       Exhibit 6.  In 1993, did you borrow $240,000?

11  A.   I do not recall.

12  Q.   The mortgage says that you borrowed $240,000 in

13       1993?

14  A.   It does.

15  Q.   Does that help you remember if, in fact, you did

16       borrow $240,000?

17  A.   I believe I did, but it doesn't help me remember.

18  Q.   Why do you believe you did?

19  A.   Because of this, appears that I signed it.  It's

20       a mortgage.  It's been recorded here, so --

21  Q.   In 1994, did you borrow $500,000?

22  A.   Is that the one you're referring to?

23  Q.   Mm-hmm.

24  A.   It appears I did.  I don't recall, but it appears

1     I did.

2  Q.  Okay.  Was it an adjustable interest rate Note,

3     the loan in 1994, for $500,000?  I'll direct your

4     attention to the last three pages.  In the first

5     one, it says adjustable rate rider.

6  A.  Okay, that appears it is, yes.

7  Q.  So 1994, when you borrowed $500,000, did you

8     understand the difference between an Adjustable

9     Rate Note and a Fixed Rate Note?

10  A.  Yes.

11  Q.  What did you understand that difference to be?

12  A.  A fixed stays fixed at that number the whole life

13     of the loan, and an adjustable one can adjust

14     based on --

15  Q.  Based on what?

16  A.  I don't know.  What the Note says, based on what

17     the parameters were.

18  Q.  What kinds of things does the Note usually say

19     that the interest rate can adjust based on?

20  A.  I don't know.  Oh.

21  Q.  What does it mean, in terms of your monthly

22     payment, if you get a Fixed Rate Note or an

23     Adjustable Rate Note?

24  A.  The fixed rate, I believe, stays the same.

1  A.   I do not know.

2  Q.   Is it the same as a fixed rate Note?

3  A.   Well, it sounds like it varies, but I don't know

4       what that means -- what the difference is between

5       a variable and adjustable.

6  Q.   What does vary mean?

7  A.   It changes.

8  Q.   So, what would a variable rate Note do?

9  A.   I imagine it would change.

10 Q.   What would change?

11 A.   Interest maybe.  I think interest is what would

12      change.

13 Q.   And, again, directing your attention to Exhibit

14      8, did you borrow $600,000?

15 A.   It appears I did.  Oh, excuse me, where is the

16      number again?  Yes.  Yes.

17 Q.   In Exhibit 8, the lender was Great Western Bank?

18 A.   Yes.

19 Q.   And this was in 1997?

20 A.   Yes.

21 Q.   Why did you borrow $600,000 in 1997?

22 A.   I do not recall.

23 Q.   Did you borrow $600,000 to pay off another loan?

24 A.   I do not recall.

1   Q.   And you see that on the last -- the third to last

2        page, the heading is adjustable rate rider ARM

3        G-3?

4   A.   Yes.

5   Q.   So, was the 1997 loan also an Adjustable Rate

6        Note?

7   A.   This appears to be, yes.

8   Q.   Why did you obtain an adjustable rate loan in

9        1997?

10  A.   I don't recall.

11  Q.   Did you see a benefit to having an adjustable

12       rate loan instead of a fixed rate loan?

13  A.   I don't recall with this one; but, usually the

14       payment is less.

15  Q.   Why is the payment -- what payment is less?

16  A.   Interest payment.

17  Q.   Why is that?

18  A.   It's just the way they are structured, I believe.

19  Q.   Doesn't the payment depend on what the interest

20       rate is?

21  A.   Yes.

22  Q.   When you say that usually the payment is less for

23       a variable rate loan --

24  A.   -- adjustable.

1    Q.    -- for an adjustable rate loan, when you say that

2          the payment is less, what is the payment less

3          than?

4    A.    What it would be for a fixed.

5    Q.    Because an adjustable rate loan is related to

6          interest rates, when interest rates fall, what

7          happens to the monthly payments?

8    A.    I would imagine they would fall; but it would

9          depend on what's said in the Note.

10   Q.    When interest rates are higher, what would happen

11         to monthly payments?

12   A.    I would imagine they would go up, depending on

13         what's on the Note.

14   Q.    Going back to Exhibit 9, $750,000 -- which

15         references a $750,000 loan you obtained from

16         Washington Mutual in 1999.  Did you borrow

17         $750,000 from Washington Mutual in 1999?

18   A.    It appears I did.

19   Q.    Why did you borrow from Washington Mutual?

20   A.    I do not recall.

21   Q.    Had you dealt with Washington Mutual before?

22   A.    I don't -- the ones that you had given me before

23         have different names to them; so, I don't know.

24   Q.    Do you remember whether before 1999, you had ever

1        borrowed money from Washington Mutual Bank.

2   A.   I do not remember.

3   Q.   I would like to address your attention to the

4        page with the heading Adjustable Rate Rider, and

5        specifically to Page 1 of 6.

6   A.   Yes.

7   Q.   Was the 1999 loan from Washington Mutual Bank

8        also an Adjustable Rate Note?

9   A.   Yes, it appears it is.

10  Q.   Going back to Exhibit 10, did you borrow $223,300

11       from Chase Manhattan Mortgage Corporation?

12  A.   It appears I did.

13  Q.   This loan was in 2000, is that correct?

14  A.   That's the date, yes, July 12th.

15  Q.   Why did you borrow $223,300 in July 2000?

16  A.   Oh, I'm sorry, no, I guess that's not me.  No,

17       this one is not me.  It's got my name on it,

18       which is very strange.  I guess I spoke too

19       quickly.  I am not from Edison, New Jersey.

20  Q.   Where does it say that you are from Edison, New

21       Jersey?

22  A.   Oh.  Oh, Chase is from Edison.  Oh, okay, I read

23       that wrong.

24  Q.   So, did you borrow $223,300 in July of 2000?

1       more familiar with that.

2    Q. Why do you remember that?

3    A. Well, my -- closer to timewise. It's not back in

4       1990s.

5    Q. Please tell me about the 2004 Washington Mutual

6       loan for $810,000.

7    A. What would you like to know?

8    Q. Everything.

9    A. Ask away.

10   Q. Please tell me about the mortgage loan

11      transaction.

12            MR. BAKER: Just testify from your memory.

13   A. I was approached by my loan officer saying that

14      there was a new mortgage available that he

15      thought I might be interested in. I really

16      wasn't too interested in it, since we had just

17      refinanced a year ago; and refinancing is costly,

18      but the product was quite amazing.

19   Q. What --

20   A. -- it allowed me to pay less per month.

21   Q. Is there anything else?

22   A. That's, pretty much, what I recall.

23   Q. Is there anything else that you remember?

24   A. I remember thinking about it. We were in a good

1      financial situation at the time, and we had an

2      offer on the property of 1.6 million.

3      Previously, someone just came off the street and

4      offered us that; and so, I figured $800,000, a 50

5      percent loan to value was not something that

6      would jeopardize my family or my home.

7  Q.   Is there anything else?

8  A.   No.

9  Q.   Who was your loan officer?

10  A.   Robert Devasto, D-E-V-A-S-T-O.

11  Q.   How did you know Robert Devasto?

12  A.   We grew up three doors down from each other; but

13      I didn't really know him until years and years

14      later.

15  Q.   Before 2004, had Mr. Devasto approached you about

16      any other loans?

17  A.   I imagine so.  Yes.

18  Q.   Which loans did he approach you about?

19  A.   I do not recall.

20  Q.   In 2004, who did Robert Devasto work for?

21  A.   Washington Mutual, I believe.

22  Q.   Did Mr. Devasto approach you about the 1999

23      $750,000 loan from Washington Mutual?

24  A.   Probably, but I have to look at my records.

1   A.   I don't remember.

2   Q.   I believe that's exhibit --

3            MS. MAINOO: Please mark as Exhibit 12 an

4   April 9th, 2003 mortgage granted by Laura Sheedy.

5            (Mortgage dated April 9, 2003 marked as

6   Exhibit No. 12 for Identification.)

7   Q.   Ms. Sheedy, do you recognize Exhibit 2?

8   A.   Yes, as a mortgage.

9   Q.   Did you sign this mortgage?

10  A.   It appears to be my signature.

11  Q.   Did you borrow $795,000 from Washington Mutual in

12       2003?

13  A.   It appears I did.

14  Q.   Do you remember what the purpose of the loan was?

15  A.   No, I do not.

16  Q.   Earlier you testified that you refinanced in

17       2003.

18  A.   I do not believe I remembered that date, but

19       okay.  Yes, it's --

20  Q.   -- what do you understand by refinance?

21  A.   What do I understand by refinance?

22  Q.   What do you understand refinance to mean?

23  A.   That you change the mortgage that you currently

24       have.

1      rehabilitation of it.

2   Q.  Did your husband participate in this investment

3      -- in the 15 to 17 Page Place property?

4   A.  I do not remember in what capacity, if he did.

5   Q.  Was your investment in the 15 to 17 Page Place

6      property part of your real estate business?

7   A.  Probably.  My husband's and mine, yes.

8   Q.  In addition to answering telephones and typing

9      papers, did you buy and sell properties for

10     investments?

11  A.  Yes.

12  Q.  What else did you do in your real estate

13     business, Ms. Sheedy?

14  A.  Answer phones, type papers.

15  Q.  Did you borrow money, too?

16  A.  Yes, my name is on those mortgages.

17  Q.  Did you borrow money in connection with your real

18     estate business?

19  A.  Yes.

20  Q.  What kinds of loans did you take out, related to

21     your real estate business?

22  A.  I don't understand the question.

23  Q.  Did you take out fixed rate Notes?

24  A.  I might have.

1      just did that on a calculator?

2   Q.  Would you like to verify it?

3   A.  Okay.

4   Q.  So, let's say $17,000 a month --

5   A.  -- okay.

6   Q.  -- for you and your husband in 2004.

7   A.  Okay.  If that's what you came up with.

8   Q.  On the loan application, it says that you and

9      your husband's monthly income was $30,000?

10  A.  Okay.

11  Q.  Is the loan application correct?

12  A.  It the loan application correct?  I don't know

13     the difference between adjusted gross income and

14     gross income, so you might have to explain that

15     to me.

16  Q.  Is there a reason to think that the difference

17     between adjusted gross income and gross income

18     would be almost twice as much?

19  A.  Well, we have our -- we run a business, and we

20     have a lot of expenses that we have to adjust.

21  Q.  We should refer back to the tax return, which is

22     Exhibit 13.  So, your total income, according to

23     Exhibit 13, line 22, was $203,378, is that

24     correct?

1  A.  That's what it says.  That is what that line

2      says.

3  Q.  And your adjusted gross income, according to line

4      36, was $203,378?

5  A.  That's what that line says.

6  Q.  So, according to your 2004 tax return, there was

7      no difference between your total income and your

8      adjusted gross income?

9  A.  Well, I am out of my field.  You will have to

10     talk to my accountant.

11 Q.  Did your loan application, Exhibit 20, accurately

12     state the total monthly income for you and your

13     husband?

14 A.  I believed it did.

15 Q.  How did you come up with this figure for your

16     monthly income?

17 A.  That was actually on the application when it came

18     to the table.

19 Q.  And it was your responsibility to verify that the

20     application was correct, wasn't it?

21 A.  I reviewed it, and I did not see anything that

22     jumped out on me, other than the Lexington

23     Funding.

24 Q.  Was your first mortgage, principal and interest,

1           (Addendum to Loan Application marked as

2      Exhibit No. 21 for Identification.)

3   Q.   Ms. Sheedy, are you familiar with Exhibit 21?

4   A.   It is an addendum to a loan application.

5   Q.   Do you recognize Exhibit 21?

6   A.   As an addendum to a loan application.

7   Q.   Did you sign the addendum to loan application,

8      Exhibit 21?

9   A.   It appears that that is my signature.

10  Q.   You signed the addendum to loan application on

11     April 15th, 2004, right?

12  A.   That's the date that is on there.

13  Q.   Is there a reason to think that you did not sign

14     the addendum to loan application on the date that

15     is on there?

16  A.   I can't remember the exact date of the closing.

17     I thought it was the 16th -- no.  That would be

18     strange.

19  Q.   And I want you to read on Page 1 of Exhibit 21,

20     under Disclosure of Right to Receive a Copy of an

21     Appraisal.

22  A.   I'm sorry, what would you like me to do about

23     that?

24  Q.   I would like you to read the three lines

1      following Disclosure of Right to Receive a Copy

2      of an Appraisal.

3   A.  "If you're applying for a loan to be secured by a

4      one to four family dwelling, you have the right

5      to a copy of any appraisal or other property

6      valuation used in connection with your

7      application for credit, as long as you have paid

8      sufficient funds to cover the cost of the

9      appraisal."

10  Q.  Did you request a copy of the appraisal?

11  A.  I don't know if I did.  I don't remember.

12  Q.  Did you receive a copy of the appraisal?

13  A.  I don't think so.

14  Q.  At the time, did it bother you that you did not

15      receive a copy of the appraisal?

16  A.  No.

17  Q.  Is there a reason why it did not bother you that

18      you did not receive a copy of the appraisal?

19  A.  Well, I mentioned earlier that we -- someone had

20      walked in off the street and offered us 1.6

21      million dollars for the property years before,

22      so, like I said, I thought an $800,000 mortgage

23      was quite conservative.

24  Q.  Did you know what the tax assessment of the

1      property was in 2004?

2  A.   No.

3  Q.   On Page 2 of Exhibit 21, can you read the

4      Certifications lines -- the first three lines

5      until 3.

6  A.   "I certify by signing below that (1) if an

7      Adjustable Rate Mortgage has been selected, I

8      have received a copy of the consumer handbook on

9      Adjustable Rate Mortgages and the appropriate

10     Adjustable Rate Loan Disclosure Statement.  All

11     of the loan application" -- and No. 2, "all of

12     the loan application information provided is true

13     and complete."  No. 3?

14  Q.  No, that's it.  And then, at the bottom, the two

15     lines just before your signature?

16  A.  "By signing below, each applicant hereby

17     acknowledges making the above certifications and

18     authorizations and (2) that each applicant has

19     received and understands the above notices and

20     disclosures."

21  Q.  Ms. Sheedy, did you receive a copy of the

22     consumer handbook on Adjustable Rate Mortgages?

23  A.  I do not remember.

24  Q.  Is there any reason to think that you did not

1    in 2004?

2    A.    In 2004?

3    Q.    When you obtained the mortgage loan.

4    A.    Well, it appeared to be -- now, I mean, I don't

5    know what I knew then; but now I see that it was

6    a thousand dollars difference in the payment, so

7    that was quite enticing -- a thousand dollars a

8    month less in payments, and I knew the value was

9    there; so, that was fine.

10    Q.    Did it worry you that you would not be paying --

11    did you ever consider making some of the

12    principal -- making payments on principal during

13    the first five years?

14    A.    I did consider it.

15    Q.    Is there a reason why you did not make the

16    payments on principal during the first five

17    years?

18    A.    My children were going to go to college.    I

19    needed to think about that.

20        MS. MAINOO: Please mark as Exhibit 23 the

21    Fixed/Adjustable Rate Note signed by Laura Sheedy

22    and Thomas Sheedy.

23        (Fixed/Adjustable rate Note marked as

24    Exhibit No. 23 for Identification.)

1   Q.   Ms. Sheedy, do you recognize Exhibit 23.

2   A.   Fixed/Adjustable Rate Note.

3   Q.   Did you sign Exhibit 23?

4   A.   That appears to be my signature.

5   Q.   Is that your husband's signature on the right?

6   A.   That appears to be.

7   Q.   What were the terms of the Fixed/Adjustable Rate

8       Note, Exhibit 23?

9   A.   Where would that be found?

10   Q.   You can begin with, 1. Borrower's promise to pay.

11   A.   Unh?

12   Q.   What did you borrow under this Note?

13   A.   I borrowed $810,000.

14   Q.   What was the interest rate?

15   A.   The interest rate, as written in No. 2, is 3.625.

16   Q.   In the next sentence, is that the interest rate

17       may change in accordance with Section 4?

18   A.   Yes.

19   Q.   Let's go ahead to Section -- and, did you

20       understand the statement that the interest rate

21       may change -- that the interest rate of the Note

22       may change?

23   A.   Yes.

24   Q.   You understood that this was an Adjustable Rate

1      Note?

2   A.   Yes.

3   Q.   Did you know that the interest rate could change

4        on the first day of May 2009?

5   A.   I don't remember if it was May, but I did know

6        that in 2009, that there could be a change.

7   Q.   On Page 2, the Note provided that the interest

8        rate would be between -- well, that the interest

9        rate would never be greater than 8.625 percent?

10  A.   Yes.

11  Q.   And, you understood that the interest rate could

12       change on the first day, and it would not be

13       greater than 8.625 percent or less than 2.75

14       percent?

15  A.   Yes.

16  Q.   Do you understand how Washington Mutual would

17       calculate the change in your interest rate?

18  A.   No.

19  Q.   Under Section C, the Note provided that

20       Washington Mutual would add 2.75 percentage

21       points to the current index; did you understand

22       that when you read it in 2004?

23  A.   What was the question again?

24  Q.   Did you understand that Washington Mutual would

1   A.   Correct.

2   Q.   You knew that the interest rate would be fixed

3        for the first five years?

4   A.   Correct.

5   Q.   That the initial fixed interest rate for the

6        first five years was 3.625 percent?

7   A.   If that is what that said, yes.

8   Q.   You knew that the interest rate would adjust

9        after 2000 -- would adjust in 2009?

10  A.   Correct.

11  Q.   You knew that you had the option to make interest

12       only payments from 2004 until 2009?

13  A.   Yes, I also had the option to do principal

14       payments as well, yes.

15  Q.   And you knew that starting in 2009, you would

16       have to make payments toward principal?

17  A.   Whether I knew that then or not, I know that now,

18       as I read that.

19  Q.   But the documents that you received in 2004 told

20       you that?

21  A.   Yes, they do.  Yes, they do.

22  Q.   And, in fact, in 2000 -- beginning in 2009, your

23       interest rate and your monthly payments changed,

24       right?

1      the loan?

2  A.  I am not sure.

3  Q.  Did you stop making your monthly payments before

4      or after your payments changed from interest rate

5      -- from interest only payments in 2009?

6  A.  I believe I made payments after it changed.  When

7      did it change to May?

8  Q.  I believe it changed in -- let's go back and look

9      at Exhibit 35.  It changed starting for the

10     payment due June 1st, 2009.

11  A.  I'm pretty sure I did.

12  Q.  It says, you stopped making payments after June

13     1st, 2009.

14  A.  It might have been September.  I'm not sure.  I

15     don't remember.

16  Q.  September of what year?

17  A.  2009.

18  Q.  What was the reason for your failure to make

19     payments around September of 2009?

20  A.  Our income stopped, and the payment adjusted to

21     include principal.

22  Q.  How did your income stop?

23  A.  The people weren't paying us.  We were not

24     getting the income from the mortgages that were

1   A.   I don't remember.  I did submit one.  I don't

2       remember when.

3             MS. MAINOO: Please mark as Exhibit 40 a

4       October 4th, 2010 letter by Laura M. Sheedy and

5       Thomas E. Sheedy.

6             (Letter dated October 4, 2010 marked as

7       Exhibit No. 40 for Identification.)

8   Q.   Ms. Sheedy, do you recognize Exhibit 40?

9   A.   Yes.

10   Q.   Did you draft Exhibit 40?

11   A.   Yes.

12   Q.   What is Exhibit 40?

13   A.   I would call it a hardship letter.

14   Q.   Who did you send this hardship letter to?

15   A.   Chase, I believe.

16   Q.   In the last line of Exhibit 40, can you read what

17       you said?

18   A.   "By September of 2009, when I made the mortgage

19       payment with my credit card, the reality of the

20       situation hit us.  Our financial bind was getting

21       worse.  We approached Chase a number of times,

22       asking if they would let us go back to our

23       interest only payments.  They said no."

24   Q.   Is it true that you contacted Chase to ask to go

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF SUFFOLK

I, Isolde von Handorf-Choquet, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition of LAURA M. SHEEDY was taken before me on Tuesday, November 29, 2011.

The said witness was duly sworn before the commencement of her testimony; that the said testimony was taken stenographically by myself and then transcribed. To the best of my knowledge, the within transcript is a true and accurate record of said deposition.

I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter in controversy.

In witness whereof, I have hereunto set my hand and Notarial Seal this 16th day of December, 2011.


Isolde von Handorf-Choquet
Notary Public
My Commission expires:
April 25, 2014


PLEASE NOTE:
THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.